IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **DARRYL SMITH**, | Case No. 1:17-cv-01910-IM |
| Petitioner, | **OPINION AND ORDER** |
| v. | |
| **OREGON DEPARTMENT OF CORRECTIONS**, | |
| Respondent. | |

**IMMERGUT, District Judge.**

Petitioner Darryl Smith ("Smith"), an individual in custody at the Warner Creek Correctional Facility at the time of filing, brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254. For the reasons that follow, Smith's Second Amended Petition for Writ of Habeas Corpus (ECF No. 83) is DENIED, and this proceeding is DISMISSED, with prejudice.

///

///

PAGE 1 – OPINION AND ORDER

## BACKGROUND

In April 2012, a Jackson County grand jury returned an indictment charging Smith with five counts of Arson in the First Degree; three counts of Burglary in the First Degree; and one count each of Aggravated Animal Abuse in the First Degree, Animal Abuse in the First Degree, and Criminal Mischief in the First Degree.[1] (Resp't Exs. (ECF No. 26), Ex. 102 at 3-6.[2]) The charges arose from a fire that damaged the home of Smith's ex-girlfriend, Chelsea McDougal ("McDougal"), and caused the death of her pet rabbit. Smith pleaded not guilty and proceeded to trial before a jury in October 2013.

### I.    Trial Court Proceedings

#### A.    The State's Case at Trial

The State asserted at trial that in the early morning hours of February 17, 2012, Smith intentionally set fire to McDougal's home in Medford, Oregon, killing McDougal's rabbit, destroying her belongings, and endangering neighbors and first responders. Although no one witnessed Smith set the fire, the State presented a variety of evidence that suggested Smith was responsible, including evidence of Smith's potential motive; a step-by-step analysis of the fire and its likely cause; and circumstantial evidence tying Smith to the scene.

##### 1.    Smith and McDougal Have a Tumultuous Relationship and Acrimonious Breakup

McDougal testified that she began a romantic relationship with Smith in 2010. (Resp't Ex. 104 at 9.) McDougal characterized their relationship as "back and forth" — at times "really good" and at other times "[not] so good." — and noted her suspicion that Smith was unfaithful. (*Id.*)

---

[1] The operative indictment was returned on April 18, 2012.

[2] When citing to Respondent's Exhibits, the Court refers to the page numbers listed in the lower right corner of each exhibit.

Despite these issues, McDougal and Smith moved in together in December 2010, had a child together in February 2011, and worked toward repairing the relationship. (*Id.* at 10, 27.)

By late 2011, McDougal decided that the relationship was not working and planned to leave. (*Id.* at 11.) McDougal testified that at that time, she saw little of Smith because they worked opposite shifts and, as a result, she felt that they were "[m]oving toward [just being] roommates." (*Id.*) She did not, however, tell Smith when she began dating someone new in December 2011. (*Id.* at 12.) McDougal testified that when Smith learned of her new relationship shortly after New Year's Day, he became "really upset" and threw the vacuum cleaner through the wall. (*Id.*) McDougal also testified that Smith threw glasses at her, one of which sliced her toe open, and took her cell phone until she "eventually" recovered it sometime later. (*Id.* at 12, 16.)

Things were "pretty bad" between McDougal and Smith in the weeks that followed. (*Id.* at 13.) McDougal testified that Smith began returning home from work early and "breaking things." (*Id.*) McDougal also testified that Smith fought with her over custody of their child, broke her cell phone in half, and took the cellular memory card. (*Id.* at 13-14, 16.) Although McDougal had leased the home they shared, Smith refused to leave, ultimately forcing McDougal to escape the "constant domestic drama" by staying with a friend, Stephanie Whiteman ("Whiteman"). (Resp't Ex. 104 at 13-14.) McDougal finally returned home after she obtained a restraining order against Smith in late January 2012, forcing him to vacate the premises. (*Id.* at 15.)

### 2.    A Fire Starts in McDougal's Home that Later is Determined to have been Intentionally Set

On the afternoon of February 16, 2012, McDougal and her children traveled to California to visit family. (*Id.* at 20.) That night, a fire started in McDougal's home that caused significant structural damage and the death of her pet rabbit. (Resp't Ex. 103 at 139.) Ralph Sartain

("Sartain"), a fire inspector for the City of Medford Fire Department, was dispatched to the scene at 2:44 a.m. to determine the cause of the fire. (*Id.* at 120, 121.)

After fire crews extinguished the blaze, Sartain carefully inspected the wreckage. (*Id.* at 122.) Sartain began his investigation toward the back of the house, explaining that "to determine where and how the fire moved," he had to start with the least damaged areas and work toward the most damaged areas. (*Id.* at 122.) Sartain concluded that none of the back rooms were involved in the fire because the lack of charring in and around the hallway indicated the fire had not moved in that direction. (*Id.* at 127.)

Sartain then moved forward into the laundry room and examined the electrical circuit panel. (*Id.* at 129-30.) Sartain testified that he observed no tripped or misaligned circuits and thus ruled out an electrical trip as the source of the fire. (*Id.* at 130.) Sartain testified that he also examined the furnace, which was the only "fuel fired appliance" in McDougal's home, and found no evidence of fire under the exterior panel. (*Id.* at 131.) Sartain thus ruled out the furnace as the cause of the fire. (*Id.*)

Sartain next moved into the kitchen and noted that the microwave door and various cabinets and drawers stood open. (*Id.* at 132.) Sartain testified that this was "peculiar" because "regardless of how . . . much of a pigsty some people may have or may not have, they usually keep their cabinets closed." (*Id.*) Sartain then examined the electric stove and observed that the burner knobs were in the "off" position and the coils were in place on the stovetop. (*Id.*) Sartain testified that when he lifted various items, he observed soot deposit, which indicated that the kitchen was a "protected area." (*Id.*) Sartain thus ruled out the kitchen as the fire's point of origin and, based on the damage pattern, concluded that the fire had come from the direction of the living room. (*Id.* at 133.)

Sartain next moved toward the living room and examined the front door. (*Id.*) He noted that the first officer on the scene had "booted the front door[,]" and that he observed corresponding damage to the door and the jamb. (*Id.* at 134.) Sartain concluded from the damage and from the lack of charring around the door that it had been closed and locked with the deadbolt engaged during the fire. (*Id.* at 136-37.)

Turning to the living room and its contents, Sartain observed that the couch had clothing piled on it and had sustained significant damage and charring, indicating that "all the objects on [the] couch were involved in the fire." (*Id.* at 138.) He determined, however, that the fire had been pushed in the direction of the couch when fire fighters vented a nearby window and had not started there. (*Id.*) Sartain next inspected the entertainment center, observing that the wiring was intact and that there was no evidence of "beading or an electrical arching" that would be indicative of an electrical fire. (*Id.* at 141-42.) Based on the relatively protected condition of the electrical outlets and the surge protector still plugged into the wall, Sartain concluded that none of the electronics in that area that had caused the fire. (*Id.* at 143.)

Sartain then focused on an area where a bookcase had been. (*Id.* at 146.) Sartain noted that items on the bookcase showed "direct flame involvement" and that the fire had penetrated the interior wall behind the bookcase all the way to floor in a "clean burn," meaning that the wall had burned until it "had nothing left to give." (*Id.* at 147.) Sartain testified that the significant damage and charring to the interior wall indicated that "the fire burned [there] for a period of time . . . before it was discovered," and that the fire's movement from that area indicated that it likely occurred there. (*Id.* at 150.) Because the damage showed that the fire had burned away from the base of the bookcase, going "up and in versus out," Sartain determined the fire had not started on

the interior wall. (*Id.* at 149.) Sartain thus ruled out "any type of electrical failure" as the fire's cause. (*Id.*)

Sartain testified that he otherwise found nothing near the bookcase that could have started the fire. (*Id.* at 151.) Specifically, he found no evidence of candle use, match sticks, or cigarette butts. (*Id.* at 151-52.) Sartain also found no evidence that chemicals had been present when the fire started. (*Id.* at 152.) Sartain thus concluded that the fire was not natural or accidental and was instead incendiary, meaning "someone intentionally started the fire." (*Id.* at 153.) Although Sartain could not pinpoint the exact object that had started the fire, he determined that someone likely used a cellulose-based material — such as paper, books or photographs — to introduce heat and flame to the bookcase until it ignited. (*Id.* at 168-70.)

### 3.    Circumstantial Evidence Suggests Smith is Responsible for the Fire

#### a.    Previous Threats

The State called several witnesses who testified that they had heard Smith threaten McDougal's pets and belongings in the weeks before the fire. McDougal herself testified that shortly after she fled her home in January 2012, Smith "followed [her] around town" and called her "over, and over again[.]" (Resp't Ex. 104 at 18.) McDougal testified that when she answered the phone, Smith told her that "the curtains were on fire, the rabbit is in the bathtub, [and] all your shit's gone." (*Id.*)

Whiteman similarly testified that while McDougal was staying with her in January 2012, the police were called to handle a child custody dispute between Smith and McDougal. (Resp't Ex. 103 at 177.) While the police investigated the situation, Smith repeatedly called McDougal's cell phone. (*Id.* at 178.) Whiteman testified that when she finally answered McDougal's phone,

Smith told her that "he was going to burn [McDougal's] stuff, and [that] the animals were gone . . . [because] he was going to kill them." (*Id.*)

Finally, Felicia Vaniman ("Vaniman"), who lived next door to McDougal, testified that she sometimes provided childcare for McDougal's children while McDougal lived with Smith. (*Id.* at 52.) Vaniman testified that "[McDougal] always was crying" toward the end of the relationship, and that she had witnessed "[Smith] . . . yell at [McDougal] one day, say[ing] take your fucking cat" before throwing McDougal's cat across the yard. (*Id.* at 50-52.) Vaniman testified that she also heard Smith say that he was going to light McDougal's animals on fire. (*Id.* at 51.) Vaniman stopped caring for McDougal's children in early February 2012, explaining that she became frightened after seeing Smith "hacking [McDougal's] tree[,] . . . calling her a whore, and punching the fence[.]" (*Id.* at 53.)

### b.    Opportunity and Timing

The State presented evidence that Smith had opportunity to start the fire and knowledge that McDougal and the children were absent from the home. The night of the fire, Smith worked the graveyard shift at a truck stop in Phoenix, Oregon. (Resp't Ex. 103 at 99-100; Resp't Ex. 104 at 153.) One of Smith's duties was going outside occasionally to check the parking lot, which generally took between five and ten minutes. (Resp't Ex. 104 at 103.) Smith otherwise cleaned or sat on a stool inside the store. (*Id.* at 70.)

The truck stop had no video surveillance equipment monitoring the parking lot the night of the fire, but police recovered video surveillance footage from inside the store. (*Id.* at 103.) The footage showed Smith removing his work shirt, taking a pair of gloves, and leaving the store at 2:06 a.m. (*Id.* at 103-04, 109.) Smith did not reenter the store until 2:39 a.m. (*Id.* at 109.)

Although there was no footage of Smith's movements once he left the store, his coworker that night, Stephanie Stewart ("Stewart"), testified that Smith could have left the truck stop without her knowledge because she did not "keep close watch on him" or his vehicle. (Resp't Ex. 103 at 100.) Smith denied leaving the truck stop but acknowledged that it was only a five-and-a-half-minute drive to McDougal's home and that McDougal "might have" told him that she would be out of town with the children the day of the fire because normally he would have picked up his daughter that day. (Resp't Ex. 104 at 69, 79, 153.)

### c. Evidence Tying Smith to the Scene

#### i. Smith's Vehicle is Seen Near McDougal's Home Immediately Before the Fire

The State introduced the testimonies of two witnesses who saw Smith's Vehicle near McDougal's home immediately before the fire began. The first witness, Vaniman, testified that she was lying in bed the night of the fire when she heard "a loud thumping noise" sometime between 2:00 and 2:15 a.m. (Resp't Ex. 103 at 54, 62-63.) Vaniman testified that she looked out the window and saw Smith's car parked in McDougal's driveway. (*Id.*) Vaniman explained that at the time, she "didn't think anything of it" because she had seen Smith come and go as he pleased and because McDougal was not home. (*Id.* at 60.) Vaniman testified that within minutes of lying back down, she "heard a lady pounding on [McDougal's] front door screaming that the place was on fire[.]" (*Id.* at 54.)

The second witness, Michelle Hauser ("Hauser"), lived across the street from McDougal and testified that she had trouble sleeping the night of the fire. (*Id.* at 66, 68.) Hauser explained that shortly after 2:00 a.m., she heard "blaring music" coming from the left side of her front door. (*Id.* at 68.) When she looked out of her window, Hauser saw Smith's car parked on the corner. (*Id.* at 68-69.) Hauser was "uneasy" about seeing Smith's car, explaining:

PAGE 8 – OPINION AND ORDER

. . . it's usually in his driveway, and I mean I know the hours or thought I knew the hours he was working, and he was supposed to have been at work, or had the night off and been at home. My assumption was that he was supposed to have been at work. So it was very unnerving to me, so I kind of just listened . . . and I heard the car pull [into McDougal's driveway approximately nine minutes later]. Well I knew that Chelsea had gone . . . to California to visit her parents. So I found it odd that he just pulled up there real quick. I didn't see [Smith] go in, but I saw him come out, and he was in a rather hurry, and got into the car, and sped off down [the] street[.]"

(*Id.* at 70-71, 76.) Hauser testified that she became aware that McDougal's house was on fire "maybe ten minutes" after she watched Smith leave. (*Id.* at 72.)

### ii.    Access to McDougal's Home

The State presented evidence that suggested Smith had access to McDougal's home the night of the fire. McDougal testified that when Smith vacated her home at the end of January 2012, he did not return his house key. (Resp't Ex. 104 at 17.) Sometime in early February, McDougal returned home to find the memory card Smith previously had taken from her cell phone "just sitting there" on the center console of her couch. (*Id.* at 17, 18.) McDougal testified that the memory card could not have been overlooked and that someone in the household would have noticed it had it been there prior. (*Id.* at 17.) McDougal explained that because the house was locked while she was gone, someone would have needed a key to place the memory card on the couch. (*Id.* at 18.)

The State also presented evidence that Smith had been in McDougal's home the night of the fire. Specifically, McDougal testified that when the family left for California, a small baseball bat Smith had given to her son was sitting on her son's desk in his room. (*Id.* at 23.) The bat was unique and distinctive because Smith's father had given it to him when he was a child. (*Id.*) When McDougal and her children combed the house for items to salvage after the fire, McDougal's son reported that the bat was missing. (*Id.* at 102.) McDougal informed the police, and a detective later

identified the bat sitting on the front passenger floorboard of Smith's car in a photo of the vehicle taken at the scene. (*Id.*)

### iii.    Apparent Knowledge of the Fire's Origin

The State presented evidence that Smith had knowledge of where the fire began in McDougal's home. Specifically, Sartain testified that Smith approached him while he was digging through the living room wreckage after the fire was extinguished. (Resp't Ex. 103 at 154-55.) Smith asked Sartain "general questions" about the fire, which Sartain acknowledged is not out of the ordinary. (*Id.*) Sartain noted that the conversation was pleasant until he started working toward the bookcase, at which point Smith's demeanor changed. (*Id.* at 155.) Sartain testified that Smith began "kind of redirecting [him] away from the area of origin" by asking what he thought about the furnace, or the items left on the couch instead. (*Id.*) Sartain vividly recalled the "weird" exchange because he "never had anybody try to redirect [him] at an investigation." (*Id.*)

### B.    The Defense Theory at Trial

The defense presented a theory of reasonable doubt that largely focused on the circumstantial nature of the State's evidence. Throughout trial, the defense pointed out inconsistencies in witness statements, the lack of evidence establishing that a specific person started the fire, and alleged deficiencies in the fire investigation. (Resp't Ex. 104 at 187.) The defense also attempted to undermine the State's case through the testimony of Krystal Daniel, an investigator for the defense, who testified that she had interviewed Smith's coworker, Stewart, several times, and that Stewart had maintained that she never saw Smith's car leave the parking lot of the truck stop the night of the fire. (*Id.* at 121.)

Smith testified on his own behalf and countered the State's narrative with an alternative version of events. Smith testified that he arrived at the truck stop around 11:45 p.m. on the night

of the fire and performed his duties as usual. (*Id.* at 126-27.) Smith testified that shortly after 2:00 a.m., he removed his work shirt "because it was an ugly green smock" and left the store to eat an early lunch in his car.[3] (*Id.* at 129-30.) Smith testified that after he finished eating, he walked to a nearby restaurant to say hello to an acquaintance, Missy, who was outside the restaurant having a cigarette with another employee.[4] (*Id.* at 130.) Smith testified that after a brief chat, he returned to the store. (*Id.*)

Smith testified that he learned McDougal's house was on fire around 3:00 a.m. (*Id.* at 134.) Smith testified that despite the restraining order against him, he decided to go to McDougal's home to see if he could salvage some of her belongings. (*Id.* at 135-36.) Smith testified that he arrived at the scene at approximately 3:45 a.m. and was there for almost an hour before a Medford police officer arrested him for violating the restraining order. (*Id.* at 137.) Smith denied leaving the truck stop until after he learned that McDougal's house was on fire, denied making threats to McDougal's pets and property, and flatly denied setting the fire. (*Id.* at 129-30, 134, 140, 145.)

The jury ultimately returned guilty verdicts on one count of first-degree arson, one count of first-degree aggravated animal abuse, and one count of first-degree burglary.[5] (Resp't Exs. 101, 105 at 3-4.) The trial court polled the jury in writing and, after reviewing the jurors' responses, stated, "the jury has indicated that this is a correct verdict." (Resp't Ex. 105 at 4.) The trial court

---

[3] Notably, Smith did not acknowledge or explain why he took a pair of gloves when he left the store.

[4] Smith did not call Missy to testify at trial nor has he provided in these proceedings a sworn statement or any other evidence that Missy could verify his version of events.

[5] Before trial, the State moved to dismiss all counts except one count each of first-degree arson, first-degree aggravated animal abuse, and first-degree burglary. (Resp't Ex. 103 at 6.)

did not specify whether the verdict was unanimous. After then hearing argument from both parties, the trial court sentenced Smith to a custodial term of ninety months. (*Id.* at 10-13.)

## II.    Postconviction Proceedings

Smith sought postconviction relief.[6] (Resp't Ex. 109.) As amended by postconviction counsel, Smith's petition for postconviction relief raised a single ineffective assistance claim based on trial counsel's failure to move for a judgment of acquittal on all counts. (Resp't Ex. 110 at 3-5.) After an evidentiary hearing, the post-conviction court denied relief. (Resp't Exs. 124, 125.)

Smith appealed, presenting a single assignment of error, as follows:

ASSIGNMENT OF ERROR: The post-conviction court erred when it entered a judgment that did not comply with [Oregon Revised Statute §] 138.640(1).

(Resp't Ex. 126 at 2.) The Oregon Court of Appeals affirmed without opinion, *Smith v. Myrick*, 281 Or. App. 284 (2016), and the Oregon Supreme Court denied review, *Smith v. Myrick*, 360 Or. 851 (2017).

## III.    Federal Habeas Proceedings

On November 29, 2017, Smith filed a *pro se* Petition for Writ of Habeas Corpus in this Court. (ECF No. 1.) Smith filed a Second Amended Petition for Writ of Habeas Corpus (the "Petition") (ECF No. 83.) through counsel on April 28, 2021, raising several grounds for relief based on the ineffective assistance of trial counsel, Smith's conviction by a nonunanimous jury[7],

---

[6] Smith initially pursued a direct appeal but subsequently moved to dismiss that proceeding through appellate counsel. (Resp't Exs. 106-108.)

[7] Smith raises his nonunanimous jury claim pursuant to *Ramos v. Louisiana*, 140 S. Ct. 1390, 1397 (2020), which held that the Sixth Amendment right to jury trial, as incorporated against the states by the Fourteenth Amendment, requires a unanimous verdict to convict a defendant of a serious offense This Court notes that Smith's assertion that his convictions were the result of nonunanimous jury verdicts appears to be wholly speculative. (*See* Resp't Ex. 105 at 4.). Nevertheless, Smith concedes in his supporting brief that because *Ramos* does not apply retroactively to cases on federal collateral review, *see Edwards v. Vannoy*, 141 S. Ct. 1547, 1559

and cumulative error. (Sec. Am. Pet. at 6-15.) Smith also raises a freestanding claim of actual

innocence. (*Id.* at 13.) Respondent urges this Court to deny habeas relief, arguing that Smith's

claims are procedurally defaulted, and that Smith cannot establish cause and prejudice or actual

innocence to excuse the default. (Resp. to Am. Pet. (ECF No. 43), at 2.[8])

## DISCUSSION

### I.    Exhaustion and Procedural Default

#### A.    Legal Standards

A habeas petitioner generally must exhaust all remedies available in state court, either on

direct appeal or through collateral proceedings, before a federal court may consider granting

habeas relief. *See* 28 U.S.C. § 2254(b)(1)(A) (instructing that a court may not issue a writ of habeas

corpus on behalf of an individual in state custody unless "the applicant has exhausted the remedies

available in the courts of the State"); *see also Smith v. Baldwin*, 510 F.3d 1127, 1137 (9th Cir.

2007) (noting that a prisoner must first exhaust available remedies before a federal court may

consider the merits of a habeas petition). Generally, a petitioner satisfies the exhaustion

requirement "by fairly presenting the federal claim to the appropriate state courts . . . in the manner

required by the state courts, thereby 'afford[ing] the state courts a meaningful opportunity to

consider allegations of legal error.'" *Casey v. Moore*, 386 F.3d 896, 915–16 (9th Cir. 2004)

(quoting *Vasquez v. Hillery*, 474 U.S. 254, 257 (1986)) (alteration in original); *see also O'Sullivan

v. Boerckel*, 526 U.S. 838, 845 (1999) (holding that "[b]ecause the exhaustion doctrine is designed

---

(2021), this claim necessarily fails. (Pet'r's Br. (ECF No. 84), at 2.) This Court thus denies
habeas relief on Smith's nonunanimous jury claim without further discussion.

[8] When citing to the parties' briefing, the Court refers to the ECF page numbers to avoid
confusion.

to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts, . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete rounds of the state's established appellate review process").

If a petitioner failed to present his claims to the state courts in a procedural context in which the merits of the claims were actually considered, the claims have not been fairly presented to the state courts and are therefore not eligible for federal habeas corpus review. *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). In this respect, a petitioner is deemed to have "procedurally defaulted" his claim if he failed to comply with a state procedural rule, or failed to raise the claim at the state level at all. *Carpenter*, 529 U.S. 446, 451(2000); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). An individual in state custody is barred from raising procedurally defaulted claims in federal court unless he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law or demonstrate that failure to consider the claims will result in fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

**B.    Analysis**

Respondent argues that Smith failed fairly to present any of his claims to Oregon's highest court, and because he no longer can do so, they are procedurally defaulted. (Resp. to Am. Pet. at 2.) Smith concedes that his claims are procedurally defaulted but argues that the default with respect to certain of his ineffective assistance claims should be excused pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). (Br. in Supp. of the Second Am. Pet. for Writ of Habeas Corpus (ECF No. 84) ("Pet'r's Br."), at 15-16.) In the alternative, Smith argues that he is entitled to proceed on the merits of his defaulted claims because he is actually innocent. (*Id.*) This Court considers each of Smith's arguments in turn.

### 1. Smith Cannot Establish Cause and Prejudice

Smith concedes that his claims are procedurally defaulted but argues that postconviction counsel's ineffectiveness in failing to present two of his claims — ineffective assistance of trial counsel for failure to consult a fire expert and failure adequately to cross-examine the State's witnesses — should excuse the default. (*Id.*)

Although the ineffective assistance of post-conviction counsel generally does not constitute "cause" to excuse a procedural default, *see Coleman v. Thompson*, 501 U.S. 722, 752 (1991) (holding that because there is no constitutional right to counsel in post-conviction proceedings, a petitioner "must 'bear the risk of attorney error that results in a procedural default'") (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)), the Supreme Court recognized a narrow exception to this general rule in *Martinez v. Ryan*: "Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective." *Martinez*, 566 U.S. at 9; *see also Detrich v. Ryan*, 740 F.3d 1237, 1244 (9th Cir. 2013) (noting that under *Martinez*, "a procedural default by state [postconviction] counsel in failing to raise trial-counsel IAC is excused if there is 'cause' for the default"). This narrow exception applies in Oregon where, by law, ineffective assistance claims must be raised and addressed in a proceeding for postconviction relief. *See State v. Robinson*, 25 Or. App. 675, 550 P.2d 758 (1976) (holding ineffective-assistance claims are "properly resolved only in a postconviction proceeding"); *Sexton v. Cozner*, 679 F.3d 1150, 1159 (9th Cir. 2012) (acknowledging that Oregon requires claims for ineffective assistance to be raised in a collateral proceeding).

To establish cause to excuse procedural default under *Martinez*, Smith must show first that his underlying claim of ineffective assistance of trial counsel is substantial insofar as it has "some merit." *Martinez*, 566 U.S. at 14. Next, he must demonstrate that his postconviction attorney was ineffective under the standards of *Strickland v. Washington*, 466 U.S. 668 (1984), for failing to raise the claim. "[T]o fulfill this requirement, a petitioner must not only show that [postconviction] counsel performed deficiently, but also that this prejudiced petitioner, i.e. that there was a reasonable probability that, absent the deficient performance, the result of the post-conviction proceedings would have been different." *Runningeagle v. Ryan*, 825 F.3d 970, 982 (9th Cir. 2017). Such a finding would necessarily require the Court to conclude that there is a reasonable probability that the trial-level ineffective assistance claim would have succeeded had it been raised. *Id.*

Smith argues that his underlying ineffectiveness claims are "substantial" because his trial attorney failed to consult with and present an independent fire analysis expert to rebut Sartain's conclusion that the fire intentionally was set on the bookcase and failed adequately to elicit on cross-examination prior inconsistent statements made by the State's witnesses. (*Id.* at 5-14.) Smith alleges that postconviction counsel in turn was ineffective in "failing to conduct an adequate investigation by failing to consult with an arson expert and by failing to raise each of the [above] ineffectiveness claims." (*Id.* at 16.) This Court disagrees.

### a.    Failure to Consult an Independent Fire Expert

Smith alleges that "[t]rial counsel's file contains no indication . . . that he consulted with a[] fire analysis expert" and that had he done so, "he would have learned that . . . Sartain's methodology or reasoning—set out not only in his testimony but in his report produced to the defense in advance of trial—as well as his conclusion that the fire was intentionally set were

wrong." (*Id.* at 7.) Specifically, Smith argues that Sartain "cites to no evidence whatsoever for his conclusion that the fire was intentionally caused" and instead erroneously "starts with four possible conclusions [and] treats the lack of evidence as evidence of intentionality rather than as requiring the conclusion that it is unknown whether the cause is natural, accidental, or intentional." (Pet'r's Br. at 7.)

"The Ninth Circuit remains sensitive to the issue of retaining and consulting with defense experts." *Leopold v. Houser*, No. 4:21-cv-00002-JKS, 2021 WL 2142605, at *5 (D. Alaska May 26, 2021); *see also, e.g.*, *Weeden v. Johnson*, 854 F.3d 1063, 1070-71 (9th Cir. 2017) (holding that trial counsel was deficient in failing to obtain a psychological evaluation where psychological evidence about the effect of petitioner's youth on her mental state had significant "exculpatory potential"); *Richter v. Hickman*, 578 F.3d 944, 953-54 (9th Cir. 2009) (en banc) (holding that trial counsel's failure to investigate and present expert testimony on blood evidence constituted deficient performance), *rev'd by Harrington v. Richter*, 562 U.S. 86 (2011). "The cases finding ineffective assistance based on defense counsel's failure to consult with an expert or offer expert testimony appear to involve situations where the prospective defense expert testimony would: 1) exonerate the defendant; 2) conflict with powerful expert testimony offered by the Government; 3) significantly weaken adverse Government expert testimony; and 4) aid in preparing defense counsel's cross-examination of the adverse Government expert testimony." *Harmless v. Martel*, No. 2:14-cv-00223-JKS, 2020 WL 977421, at *10 (E.D. Cal. Feb. 28, 2020).

Here, Smith presents no evidence as to what investigation trial counsel undertook — including whether trial counsel consulted with an expert or considered doing so — or the extent of such investigation. Instead, Smith argues that trial counsel's failure to consult an independent fire expert reasonably can be inferred from the lack of any correspondence, emails, or notes of

telephone calls concerning potential fire experts in trial counsel's file. (Pet'r's Sur-Reply in Supp. of App. for Habeas Relief (ECF No. 102), at 7.) Because there is no evidence in the record to confirm what investigative efforts trial counsel did or did not make on Smith's behalf before trial and why,[9] Smith's claim is speculative.

However, even if this Court assumes that trial counsel did in fact neglect to consult with an independent fire analyst and that such failure constitutes deficient performance, Smith has not established how expert testimony would have raised a "reasonable probability" that the outcome of trial would have been different. Indeed, Smith attempts to undermine Sartain's conclusions by presenting what appears to be his own analysis and criticism of Sartain's methodology, but he provides no evidence that an expert similarly would have concluded that Sartain's analysis was so flawed as to render his final assessment of the fire and its origin "false." (Pet'r's Br. at 8.) Although Smith states that he has consulted with "a leading national expert in arson analysis" who agreed that Sartain's "logic is fatally flawed," (Pet'r's Br. at 8.), Smith has not identified the alleged expert, nor has he submitted a sworn statement or report setting forth in detail the expert's qualifications, analysis, and conclusions, and confirming that he or she would have testified on Smith's behalf. Without such evidence, Smith cannot establish that he was prejudiced by trial counsel's alleged failure to retain an independent fire expert. *See Wildman v. Johnson*, 261 F.3d 832, 839 (9th Cir. 2001) (finding that petitioner failed to establish prejudice under *Strickland* where he "offered no evidence that an arson expert would have testified on his behalf at trial" and

---

[9] During the two years it took Smith to prepare and file his supporting brief in this case, trial counsel passed away. *See* Robert Leroy Abel Obituary, Kosec Funeral Home and Crematory, https://www.kosecfh.com/obituaries/Robert-Leroy-Abel?obId=13385705 (last accessed Mar. 18, 2022). Trial counsel therefore can no longer be consulted about his representation of Smith and the underlying criminal proceedings at issue.

instead "merely speculate[d] that such an expert could be found"); *Grisby v. Blodgett*, 130 F.3d 365, 373 (9th Cir. 1997) (holding that petitioner's speculation "about what an expert could have said is not enough to establish prejudice" under *Strickland*).

> **b.** **Failure Adequately to Cross-Examine State's Witnesses**

Smith alleges that trial counsel was ineffective for failing adequately to cross-examine several of the State's witnesses. According to Smith, trial counsel failed to sufficiently impeach Hauser's testimony that she had seen Smith at the scene before the fire when she previously had told police that she saw a Black man sitting in Smith's car outside of McDougal's house, but could not be sure that it was Smith, and "said nothing about seeing anyone exit the home[.]" (Pet'r's Br. at 10; Pet'r's Exs., Ex. A.) In addition, Smith argues that trial counsel should have impeached McDougal's testimony that a key was needed to enter her home because she previously told police that she had not changed the locks after Smith moved out because "if you pushed hard enough, [the front door] opened." (Pet'r's Br. at 13; Pet'r's Exs., Ex. D.) Finally, Smith argues that trial counsel should have addressed on cross-examination Vaniman, Whitman, and McDougal's inconsistent statements to police about Smith's threats to McDougal's animals. (Pet'r's Br. 12-13; Pet'r's Exs. B, C, D.)

The record makes clear, and Smith himself acknowledges, that trial counsel was aware of the various statements given to police after the fire and utilized them in shaping his cross-examination of the State's witnesses. (Resp't Exs. 103 at 62-63, 73-76; 104 at 24.) Although it is unclear why trial counsel decided to either limit or forego impeaching the witnesses as to the statements identified above, it appears that trial counsel made reasonable decisions to focus his cross-examination on what he could have determined to be more beneficial lines of questioning. For example, trial counsel did not attempt to impeach McDougal's testimony that a key was needed

to enter her home, but the physical evidence demonstrated that the deadbolt was engaged during the fire and that the responding officers had to kick in the door. Trial counsel reasonably could have decided to forego cross-examining McDougal about the key issue to avoid recalling the jury's attention to such evidence, which bolstered the State's theory of the case. In the absence of any evidence to the contrary, this Court cannot conclude that the manner in which trial counsel cross-examined the State's witnesses was constitutionally ineffective. *See Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (explaining that "[w]hen counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect"); *see also Dows v. Wood*, 211 F.3d 480, 487 (9th Cir. 2000) (explaining that "counsel's tactical decisions at trial, such as refraining from cross-examining a particular witness or from asking a particular line of questions, are given great deference and must . . . meet only objectively reasonable standards").

Furthermore, considering the totality of the evidence, Smith has failed to demonstrate that, but for trial counsel's failure adequately to cross-examine the State's witnesses, there is a reasonable probability that the result of the proceeding would have been different. Indeed, whatever benefit may have been realized by impeaching those witnesses would not have been enough to overcome the case against Smith, which he admits was "strong." (Pet'r's Sur-Reply at 2.)

For the reasons stated, Smith has not established that his underlying ineffective assistance of trial counsel claims are "substantial," and postconviction counsel therefore "could not have been ineffective for failing to raise the ineffective assistance of counsel claim[s] in state court." *See Sexton v. Cozner*, 679 F.3d 1150, 1161 (9th Cir. 2012) (holding postconviction counsel could not have been ineffective for failing to raise ineffective assistance of counsel claims where trial counsel

was not ineffective). Accordingly, Smith fails to demonstrate that the procedural default of his ineffective assistance claims may be excused under *Martinez*.

### 2.      Smith Cannot Establish Actual Innocence

"[A]ctual innocence, if proved, serves as a gateway through which a petitioner may pass" to overcome procedural default. *McQuiggin v. Perkins,* 569 U.S. 383, 386 (2013). A petitioner therefore may secure review of his procedurally barred claims if he "presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *Schlup*, 513 U.S. at 316. To be credible, a petitioner's claim of actual innocence must be supported with "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324.

In evaluating a claim of actual innocence, the Court must consider all the evidence, both old and new, and conclude that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327. This is an exacting standard that is satisfied "only in the extraordinary case." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted). Indeed, cases in which the *Schlup* standard has been satisfied have "typically involved dramatic new evidence of innocence." *Larson v. Soto*, 742 F.3d 1083, 1096 (9th Cir. 2013).

The Ninth Circuit has made clear, however, that a petitioner raising an actual innocence claim is not required affirmatively to prove that he is innocent of the crime for which he was convicted. *See Sistrunk v. Armenakis*, 292 F.3d 669, 673 (9th Cir. 2002) (noting that a petitioner may satisfy *Schlup* by casting doubt on the conviction in ways other than "affirmatively proving innocence"). Rather, evidence "undercutting the reliability of the proof of guilt . . . can be enough

to pass through the *Schlup* gateway." *Id.* A petitioner therefore may satisfy *Schlup* by providing evidence that "significantly undermines or impeaches the credibility of witnesses presented at trial, if all the evidence, including new evidence, makes it 'more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Gandarela v. Johnson*, 286 F.3d 1080, 1086 (9th Cir. 2002) (citation omitted). Speculative or collateral impeachment evidence "falls far short of showing actual innocence." *Id.*

In support of his actual innocence claim, Smith submits audio recordings of Mcdougal, Hauser, Vaniman, and Whiteman's police interviews after the fire, as well as the Declaration of Stephanie Stewart ("Stewart Declaration"), Smith's coworker. (Exs. to Br. in Supp. of Second Am. Pet. for Writ of Habeas Corpus (ECF No. 84-1) ("Pet'r's' Exs."), Exs A-E.) The recorded interviews contain the alleged inconsistent statements made to police by the various witnesses after the fire as discussed in Section I (B)(1)(b), *supra*, and the Stewart Declaration sets forth Stewart's attestations that she understood Smith to be "over" his relationship with McDougal by mid-January, that Smith seemed to be an "even-keeled" person, and that Smith had not appeared to be agitated or nervous at work the night of the fire. (Pet'r's Exs., Ex. E ¶¶ 6-8.)

Smith's evidence falls far short of "evidence of innocence so strong that [the] [C]ourt cannot have confidence in the outcome of the trial[.]" *Schlup*, 513 U.S. at 329. Smith's evidence at most might show that some doubt exists as to certain aspects of this case, but that is not enough to demonstrate actual innocence. *See Downs v. Hoyt*, 232 F.3d 1031, 1040 (9th Cir. 2000) (noting that "[i]t is not enough that the evidence [submitted in support of an actual innocence claim] shows the existence of a reasonable doubt"); *see also Lorensten v. Hood*, 223 F.3d 950, 954 (9th Cir. 2000) (explaining that a petitioner must demonstrate actual innocence "by a preponderance of the evidence, and he must show not just that the evidence against him was weak, but that it was so

weak that 'no reasonable juror' would have convicted") (simplified); *Coon v. Nooth*, Case No. 2:15-CV-02125-MO, 2019 WL 1118545, at \*10 (D. Or. Mar. 11, 2019) (holding that even if the petitioner could present "expert forensic testimony" establishing an alternative cause of the victim's death, "this would fall far short of establishing that no reasonable juror would have voted to convict him"). This Court therefore concludes that the proffered evidence, when considered with the evidence presented at trial, is not such that no reasonable juror would have found Smith guilty beyond a reasonable doubt. Accordingly, Smith has not established that the procedural default of his claims may be excused based on actual innocence.

To the extent Smith seeks to assert a freestanding claim of actual innocence, the Supreme Court has yet to hold that such a claim is cognizable in a federal habeas proceeding. *McQuiggin v. Perkins*, 569, U.S. 383, 392 (2013). However, on several occasions both the Supreme Court and the Ninth Circuit have assumed, without deciding, that such a claim may exist in capital cases. *House v. Bell*, 547 U.S. 518, 554-55 (2006); *Herrera v. Collins*, 506 U.S. 390, 417-19 & 427 (1993); *Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014); *see also Roberts v. Howton*, 13 F.Supp.3d 1077, 1113 (D. Or. 2014) (collecting cases). In so doing, the courts have opined that a petitioner must "'go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent.'" *Jones*, 763 F.3d at 1246 (quoting *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997)); *see also House*, 547 U.S. at 555 (Supreme Court precedent implies that freestanding claim of actual innocence requires more convincing proof of innocence than *Schlup*). The petitioner's burden under this standard is "extraordinarily high" and requires a showing that is "truly persuasive." *Carriger*, 132 F.3d at 476 (quoting *Herrera*, 506 U.S. at 417). Assuming such a claim is cognizable, Smith's failure to establish a "gateway" claim of actual innocence necessarily means he has failed to meet the "extraordinarily high" standard required to establish a

PAGE 23 – OPINION AND ORDER

freestanding claim of actual innocence. Accordingly, this Court denies habeas relief as to Smith's "actual innocence" claim.

## II.    Cumulative Error

Smith argues that he is entitled to habeas relief because the cumulative prejudicial effect of trial counsel's errors violated his constitutional rights. (Pet'r's Br. at 14.) However, all of Smith's claims, including this one, are procedurally defaulted, and this Court may not ignore the default to consider the cumulative impact of the errors alleged in those claims. Accordingly, this Court denies habeas relief as to Smith's cumulative error claim.

## III.    Unargued Claims

Smith fails to address the remaining claims for relief alleged in the Second Amended Petition. In addition, Smith does not challenge Respondent's arguments that those claims are procedurally defaulted. Accordingly, habeas relief is precluded as to Smith's remaining claims because they are procedurally defaulted, and because Smith has failed to sustain his burden of demonstrating entitlement to habeas relief on those claims. *See* 28 U.S.C. § 2248 (instructing that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true"); *see also Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (recognizing that a habeas petitioner carries the burden of proving his case).

## IV.    Evidentiary Hearing

Smith requests an evidentiary hearing so that he may "introduce live testimony and other evidence supporting and supplementing his contention that trial counsel was ineffective in failing to consult with and call an arson expert to impeach Inspector Sartain's testimony that the fire was intentionally started." (Sec. Am. Pet. at 15.) Based on the foregoing, however, an evidentiary

hearing is neither necessary nor in the interests of judicial economy. *See Schriro v Landrigan*, 550 U.S. 465, 474 (2007) (where the record in the case precludes habeas relief, a district court is not required to hold an evidentiary hearing); *see also Totten v. Merkle*, 137 F.3d 1172, 1176 (9th Cir.1998) (evidentiary hearing not required on issues that can be resolved by reference to state court record). Accordingly, Smith's request for an evidentiary hearing is denied.

## CONCLUSION

Based on the foregoing, the Second Amended Petition for Writ of Habeas Corpus (ECF No. 83) is DENIED, and this proceeding is DISMISSED, with prejudice. Smith has not made a substantial showing of the denial of a constitutional right, and therefore this Court DENIES a Certificate of Appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

DATED this ___30th___ day of March, 2022.

*Karin J. Ammergut*
Karin J. Immergut
United States District Judge